# IN THE COURT OF APPEALS OF IOWA

No. 18-0799
Filed March 4, 2020

**BRANDON LYNN SCHAUL,**
　　Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
　　Respondent-Appellee.
_____

　　Appeal from the Iowa District Court for Linn County, Sean W. McPartland, Judge.

　　Brandon Lynn Schaul appeals the denial of his postconviction-relief petition asserting various instances of ineffective assistance of counsel. **AFFIRMED.**

　　Thomas M. McIntee, Waterloo, for appellant.

　　Thomas J. Miller, Attorney General, and Benjamin Parrott, Assistant Attorney General, for appellee State.

　　Considered by Bower, C.J., and Vaitheswaran and Doyle, JJ.

**VAITHESWARAN, Judge.**

Brandon Schaul crossed the center line of a highway and struck another vehicle coming in the opposite direction, killing the driver and seriously injuring her child. *See State v. Schaul*, No. 15-0466, 2016 WL 2745934, at *1 (Iowa Ct. App. May 11, 2016). A jury found him guilty of homicide by vehicle and serious injury by vehicle while under the influence of alcohol or drugs. *Id.* at *1–2.

On direct appeal, Schaul argued there was insufficient evidence he was under the influence or that his intoxication caused the collision. *Id.* at *1. The court of appeals found sufficient evidence to support the findings of guilt, found "no error in the court's denial of Schaul's request to modify the marshalling instructions," and preserved for possible postconviction relief a claim that Schaul's trial counsel "provided ineffective assistance by failing to object on hearsay grounds when the State offered his medical records from the emergency room into evidence." *Id.* at *6.

Schaul filed an application for postconviction relief, alleging his trial attorneys and direct-appeal attorney were ineffective in several respects. Following an evidentiary hearing, the postconviction court denied the application. Schaul appealed.

Schaul contends his trial attorneys were ineffective in failing to (A) "analyze and evaluate his expert witness' report and have it corrected for math errors"; (B) "object to hearsay evidence contained in . . . medical records"; (C) "present exculpatory evidence"; and (D) "object to the inclusion of" a reference to "drugs" in certain jury instructions. He asserts (E) the "effect of" these "multiple breaches" amounted to cumulative error. Schaul also contends (F) his appellate attorney

was ineffective in "failing to challenge the trial court's denial of [his] motion to suppress."

In evaluating ineffective-assistance-of-counsel claims, we apply the familiar *Strickland* standard. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* Schaul asks us to adopt a different standard. That is not our prerogative. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa Ct. App. 2014) ("We are not at liberty to overrule controlling supreme court precedent."). In any event, the supreme court recently reaffirmed *Strickland*. *See State v. Kuhse*, ___ N.W.2d ____, ____, 2020 WL 250542, at *4 (Iowa 2020); *cf. id.* at *8 (Appel, J., concurring specially) (noting "the so-called *Strickland* 'test' is impossible to apply in a principled fashion in many cases" but finding "no choice but to apply the amorphous *Strickland* test"). We proceed to the merits, reviewing the record de novo. *State v. Ondayog*, 722 N.W.2d 778, 783 (Iowa 2006).

### A. Expert Witness

At trial, Schaul's expert witness opined that "Schaul was not intoxicated from, impaired by, or under the influence of alcohol or marijuana at the time of the collision." S*chaul*, 2016 WL 2745934, at *2. At issue on appeal is an error he made in extrapolating Schaul's blood-alcohol level at the time of the accident. On direct examination, he testified as follows: "[Schaul's] alcohol level was—converts to approximately .066 grams per deciliter. It's easier stated as a 66. To provide a point of reference for you, legal intoxication for driving is at .80 so he's below the legal limit." The expert explained his calculation as follows:

> [T]here is 71 minutes from the time of the crash to the time of the test, so in order to tell you what the level was at the time of the crash, I have to add the amount of alcohol that the body burns up or eliminates in that 71 minutes, and I calculated that to be approximately 21. So I add 21 to 45 and I get 66.

On cross-examination, Schaul conceded his calculation was incorrect. His exchange with the prosecutor was as follows:

> Q. So when you did your extrapolation calculations within the reasonable degree of medical certainty to get to your final numbers, it was your conclusion that you had to account for 71 minutes of time; right? Is that the number you used? A. Yes, it is.
> Q. Okay. But now correct me if I'm wrong. If we take the difference really from 12:46 to 2:07, isn't that really 81 minutes of elapsed time? A. Well, 12:46 to 1:46 would be 60 and 1:46 is plus 7 so 21 so, yes, it would be 81 minutes.
> Q. So the numbers—The calculations you did here are wrong, aren't they, since you used 71 minutes? A. I should have used 81.
> Q. Okay. So you agree with me that your calculations as far as the time that elapsed here, the time that you put in of 71 minutes into your calculations, that throws your numbers off; right? A. It throws my numbers off slightly from—
> Q. That's my point. A. Yeah, it does.
> Q. Okay. So the results would be higher; right? A. They would be.
> Q. . . . [S]o basically we're talking about 72, right, .072? A. .072.
> Q. Right? A. So it's six milligrams higher than 66.

Schaul claimed trial counsel was ineffective in failing to elicit an accurate calculation on direct examination. The postconviction court concluded "trial counsel" breached "an essential duty by failing to catch and correct the error in [the expert's] calculations prior to his cross-examination" but Schaul "failed to meet his burden of establishing sufficient prejudice from the error related to [the expert's] testimony."

On appeal, Schaul contends the math error resulted in "the complete and irreversible undermining of [the expert's] credibility with the jury" and, but for the

error, there is a reasonable probability the outcome would have been different. *See State v. Albright*, 925 N.W.2d 144, 151–52 (Iowa 2019) ("For the second prong—prejudice—the claimant must prove there is a reasonable probability that the outcome of the proceeding would have been different but for counsel's unprofessional errors."). "A 'reasonable probability' means a 'substantial,' not 'just conceivable,' likelihood of a different result." *State v. Madsen*, 813 N.W.2d 714, 727 (Iowa 2012) (quoting *State v. King*, 797 N.W.2d 565, 572 (Iowa 2011)).

On the cold page, we cannot gauge whether the error had an adverse effect on the expert's credibility. *See Iowa Supreme Court Comm'n on the Unauthorized Practice of Law v. Sullins*, 893 N.W.2d 864, 871 (Iowa 2017) ("As difficult as it is to assess credibility of live testimony, it is more difficult to assess credibility from a cold transcript." (quoting *In re Marriage of Woodward*, 228 N.W.2d 74, 75 (Iowa 1975))). And we are not convinced the postconviction testimony of Schaul's attorneys assist us in the endeavor. Although one of the attorneys testified the expert's "credibility was undermined," he conceded the jurors could "assess the evidence in any manner they s[aw] fit" and he agreed the attorneys had no reasonable way of concluding which evidence or testimony the jury relied on in making its assessment. Schaul's second attorney similarly voiced her belief that the math mistake "shot" the expert's credibility, but she did not discuss jurors' reactions or otherwise support her belief. The expert's credibility is not a factor in our prejudice analysis.

More to the point is the evidence of impairment. The record on this question was the same with or without the expert's math mistake, because the expert confirmed his revised calculation would not change his opinions "as to whether Mr.

Schaul was under the influence of alcohol at the time of the accident." He testified, "Six milligrams of alcohol, that difference would not change any of the words or strength of the—any of the opinions that I have expressed."

Offsetting the expert's opinion that Schaul was not impaired were (1) Schaul's admission to consuming "eight to ten beers the night of the collision" and "smoking marijuana the afternoon before the collision"; (2) an officer's statement that [Schaul] "smelled like alcohol"; (3) "the admission of Schaul's expert that his blood alcohol level at the time of the collision was .072 together with the State's expert opinion that impairment could be "seen with blood alcohol content as low as .05"; (4) a description of Schaul as "disoriented, dazed, in shock, very upset, in an excited state and very agitated"; and (5) descriptions of Schaul's "erratic behavior following the collision." On direct appeal, we determined this evidence amounted to substantial evidence in support of the "under-the-influence element of the offenses." *Schaul*, 2016 WL 2745934, at *3.

We recognize substantial evidence is a less stringent standard than the *Strickland*-prejudice standard. *See Moss v. State*, No. 15-1624, 2016 WL 5408092, at *6 (Iowa Ct. App. Sept. 28, 2016) (citing *State v. Hensley*, 534 N.W.2d 379, 384 (Iowa 1995)). But it is a worthy starting point. *See Albright*, 925 N.W.2d at 152 ("To make [the *Strickland*-prejudice] determination, we consider what factual findings counsel's errors affected and whether the effect was pervasive or isolated and trivial." (citing *State v. Graves*, 668 N.W.2d 860, 882–83 (Iowa 2003)).

In addition to the cited evidence, the record contained evidence (1) of "both empty and full beer cans in the passenger compartment of the vehicle"; (2) that Schaul "was traveling fifty-five miles per hour . . . five seconds prior to impact";

(3) from an event data recorder that "the brakes had not been applied"; (4) from the scene of the accident that brakes were not applied; and (5) that Schaul refused to submit to breath or blood tests, which the jury was instructed could be considered "a refusal." *See State v. Fogg*, No. 18-0483, 2019 WL 1933993, at *3 (Iowa Ct. App. May 1, 2019) *aff'd*, 936 N.W.2d 664 (Iowa 2019) (noting a defendant "denied being impaired . . . but refused to submit to both a preliminary breath test and chemical testing" and "[t]he jury was instructed it could consider Fogg's refusal to submit to a breath test in reaching its verdict").

This was not a "close case" as Schaul contends; the evidence of impairment was overwhelming. *See Madsen*, 813 N.W.2d at 729 (finding "[o]verwhelming evidence" to support guilt under one of the counts and, accordingly, no *Strickland* prejudice); *State v. Hunt*, No. 16-0068, 2017 WL 512490, at *5 (Iowa Ct. App. Feb. 8, 2017) (finding "overwhelming evidence of" impairment); *State v. Thomas*, No. 15-1533, 2016 WL 5930639, at *2 (Iowa Ct. App. Oct. 12, 2016) (finding "overwhelming" evidence of intoxication); *Lint v. State*, No. 04-0907, 2005 WL 1224742, at *3 (Iowa Ct. App. May 25, 2005) (stating "there was overwhelming credible evidence that [the defendant] was operating a motor vehicle while intoxicated when he was stopped"). Accordingly, we affirm the district court's denial of this ineffective-assistance-of-counsel claim.

### B.    Medical Records

At trial, Schaul's expert referred to medical records relating to Schaul's hospitalization following the accident. The records contained several references to his intoxication or possible impairment. Schaul's attorneys objected to admission of the records based on the doctor-patient privilege analyzed in *State v.*

*Henneberry*, 558 N.W.2d 708 (Iowa 1997). The district court overruled the objection, reasoning Schaul "put his medical records at issue" and "any privilege that may have existed was waived."

At the postconviction hearing, one of Schaul's attorneys testified that, in hindsight, it was a mistake to have turned over the medical records to the prosecutor. Although she agreed the expert partially relied on them, she stated he could have rendered his opinion without them. The postconviction court found that, even if the defense handling of the records could have been construed as a breach of an essential duty, there was no *Strickland* prejudice.

On appeal, Schaul argues counsel was ineffective in failing to object to the records on the ground they were hearsay. *See* Iowa R. Evid. 5.801(c) (defining "hearsay" as "a statement that: (1) The declarant does not make while testifying at the current trial or hearing; and (2) A party offers into evidence to prove the truth of the matter asserted in the statement"). We need not address the issue because we agree with the postconviction court that Schaul could not establish *Strickland* prejudice. Specifically, given the strength of the impairment evidence as discussed above, there was no reasonable probability of a different result had counsel raised and prevailed on a hearsay objection to the medical records.

### C. Claimed Exculpatory Evidence

Schaul argues his attorneys were ineffective in failing to present evidence to impugn the driver of the other vehicle. In his view, counsel should have offered (1) evidence of the effects of certain prescription drugs the driver may have been taking, (2) her driving record, and (3) her Facebook post indicating she felt as if she was "deprived of sleep and could pass out at [her] desk."

Counsel did not breach an essential duty in failing to present this evidence. The State called a pathologist, who testified the driver had no alcohol or illegal substances in her system. Defense counsel vigorously cross-examined the pathologist and elicited an admission that the driver had a legal drug in her system, in an amount over the therapeutic range. He also elicited admissions that she had three prescription bottles in her purse. He questioned the pathologist about the possible effects of those drugs. While the physician's specialty did not allow her to opine on the subject, counsel had no duty to follow up with this line of questioning because the drugs were not found in the driver's system at the time of her death.

As for the driver's driving record, there was scant evidence her actions behind the wheel factored into the accident. Although she was traveling two miles an hour over the posted speed limit and her speed increased by two miles per hour before the collision, the evidence was virtually undisputed that the accident occurred when Schaul crossed the center line.

Finally, counsel testified he did not offer the Facebook post because it would have been subject to a hearsay objection. This was a reasonable strategic decision. *See Mummau v. State*, No. 16-1909, 2017 WL 3525294, at *3 (Iowa Ct. App. Aug. 16, 2017). The document also was of questionable relevance. A deputy sheriff trained in accident investigations testified there would have been no time for the driver to make a steering correction to avoid the head-on collision. He effectively ruled out fatigue, inaction, or error on her part as causes of the collision. Under these circumstances, counsel's failure to raise the driver's earlier sleepiness did not amount to a breach of an essential duty.

We also find no prejudice based on the evidence of Schaul's impairment summarized above. Specifically, there is no reasonable probability any impairment of the driver who died would have changed the outcome.

### D. Failure to Challenge Jury Instructions

The charges of vehicular homicide and serious injury by vehicle were based on Schaul's claimed operation of a motor vehicle "[w]hile under the influence of an alcoholic beverage or another drug or a combination of such substances" and "[w]hile any amount of a controlled substance is present in the person, as measured in the person's blood or urine." *See* Iowa Code § 321J.2(1)(a), (c) (2013). The district court granted Schaul's motion for judgment of acquittal on the "any amount of a controlled substance" alternative. In light of the ruling, Schaul asked the court to remove references to "drugs" in two jury instructions. The district court denied the request on the ground that the jury could consider whether the drug in combination with alcohol rendered him impaired. On appeal, Schaul contends his attorneys should have challenged the instructions on Double Jeopardy grounds.

"The Double Jeopardy Clause . . . protects against successive prosecutions after acquittal or conviction; and . . . it protects against multiple punishments for the same offense." *State v. Perez*, 563 N.W.2d 625, 627 (Iowa 1997). Schaul cites no authority for the proposition that acquittal on the "any substance" alternative and conviction on the "under-the-influence" alternative in the same prosecution amounts to a Double Jeopardy violation. Notably, the supreme court characterized a similar argument as "light years away from double jeopardy." *State v. Miller*, 606 N.W.2d 310, 312 (Iowa 2000). Examining whether prior convictions

used to enhance the sentence in a present case violated the Double Jeopardy Clause, the court stated, "Because the present prosecution is not for any offense previously prosecuted, double jeopardy is not implicated." *Id.*; *Cf. Perez*, 563 N.W.2d at 627 ("Where multiple punishments are imposed pursuant to a single prosecution, . . . application of the Double Jeopardy Clause is limited."); *State v. Bond*, 493 N.W.2d 826, 829 (Iowa 1992) (granting State's application for discretionary review and holding double jeopardy prohibited retrial on one of two operating-while-intoxicated alternatives where district court granted motion for judgment of acquittal on both alternatives). In the absence of precedent supporting Schaul's argument, we conclude counsel did not breach an essential duty in failing to object to the jury instructions on the ground that the references to "drugs" violated the Double Jeopardy Clause.[1]

Schaul also could not establish *Strickland* prejudice. Even if counsel had succeeded in having the court omit the "drug" references in the instructions, there is no reasonable probability of a different result, given the abundant evidence of alcohol intoxication.

### E. Cumulative Error

Schaul next argues the multiple individual errors amount to cumulative prejudice. Having found no individual errors aside from the math error, we need not address the issue. *State v. Clay*, 824 N.W.2d 488, 501 (Iowa 2012).

---

[1] Schaul mentions due process in passing, but does not elaborate. Accordingly, we have no basis for evaluating that argument.

### F. Suppression Ruling

After the collision, an ambulance took Schaul to the hospital. A deputy sheriff at the scene of the collision followed Schaul to the hospital. *Schaul*, 2016 WL 2745934, at *1. Schaul was at the hospital when he told the deputy he consumed eight to ten beers that night. *Id.* "Schaul refused to provide a blood specimen for testing, and the officer obtained a search warrant for the sample." *Id.*

Before trial, Schaul moved to suppress his hospital statements to the deputy on the ground they violated his rights under the Fifth and Sixth Amendments to the United States Constitution. The district court denied the suppression motion under the Fifth Amendment without reaching the claimed Sixth Amendment violation.

At the postconviction-relief hearing, Schaul asserted his appellate attorney was ineffective in failing to challenge the suppression ruling on direct appeal. The postconviction court summarily denied the claim. On appeal, Schaul again asserts direct-appeal counsel was ineffective in failing to challenge the suppression ruling.

First, Schaul argues "the same level of 'prophylactic' safeguards afforded Iowa citizens under the 5th and 6th Amendments through prior advisories to them to ensure actual consensual waivers of known rights should be extended to the constitutional protections under the 4th Amendment to the United States Constitution and article I, section 8 of the Iowa Constitution." He "invites" the court "to impose a requirement that officers advise individuals they have a right to refuse consent to entry and search of their personal private space they occupy in order to ensure that any subsequent consent is indeed made knowingly, intelligently, and voluntar[il]y." His "invitation" is a concession that the law did not and does not require the advisory he seeks under the Fourth Amendment. Accordingly,

appellate counsel could not have breached an essential duty in failing to challenge the suppression ruling on this ground. *See State v. Short*, 851 N.W.2d 474, 509 n.12 (Iowa 2014) (Waterman, J., dissenting) ("We do not require criminal defense counsel to be clairvoyant.")

Second, Schaul argues he was in custody at the hospital and subjected to custodial interrogation without being given *Miranda*[2] warnings. He contends his rights under the Fifth Amendment to the United States Constitution and article I, section 9 of the Iowa Constitution were violated and direct-appeal counsel was ineffective in failing to challenge the district court's ruling to the contrary. Counsel does not make an independent argument under the Iowa Constitution. Accordingly, we will focus on the Fifth Amendment. *See State v. Ingram*, 914 N.W.2d 794, 800 (Iowa 2018) ("Where state constitutional law claims have been minimally preserved . . . we may, in our discretion, decide the case based on potentially dispositive federal constitutional grounds and save our state constitutional interpretation for another day.").

"Pursuant to the Fifth Amendment [to the United States Constitution], a person questioned by the police after being 'taken into custody or otherwise deprived of his freedom of action in any significant way' must first be warned that 'he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.'" *State v. Peterson*, 663 N.W.2d 417, 423 (Iowa 2003) (quoting *Miranda*, 384 U.S. at 444). In *Miranda*, the Court held the prosecution

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966).

could not use statements "stemming from custodial interrogation of the defendant unless" these safeguards were provided. *Miranda*, 384 U.S. at 444. The Court defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*

The postconviction court concluded Schaul was not in custody when he was questioned by the deputy at the hospital. The court reasoned that "Schaul was in the hospital because of decisions made by medical personnel at the scene" and "was not brought to the hospital by law enforcement"; he "was in the emergency room, which is a very public space"; "[m]edical personnel were coming in and out of his treatment room"; "Schaul's mother visited him in the emergency room"; although the deputy testified Schaul was not free to leave, he "was admitted to a medical floor and did not leave the hospital"; the deputy "did not place Schaul under arrest"; officers "left the hospital" after blood was drawn; "[c]harges were not filed until . . . nearly two months after the accident"; "Schaul was *not* subjected to repeated questioning or repeated reinitiating of questioning"; the deputy "scrupulously followed Schaul's wishes" to speak to his attorney "and called [his] attorney 4–5 times"; the deputy "did not badger Schaul and repeatedly ask him to submit to the test"; the deputy "waited for the two hours to elapse after invoking implied consent, then simply marked down that Schaul had refused the test"; "[w]hen Schaul could not provide a good breath sample for the PBT, [the deputy] only asked him if he had been drinking"; and "[w]hen Schaul said he had been, [the deputy] simply invoked implied consent and honored Schaul's request to talk

to his attorney before deciding whether to give a blood sample." The court concluded the Fifth Amendment was not implicated.

At the postconviction hearing, appellate counsel testified by deposition that she did not challenge the district court's suppression ruling because she "determined that the court's ruling was appropriate or at least not so objectionable to raise it." In assessing the viability of counsel's belief, we apply the following four-factor test to determine whether Schaul was in custody: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of [his] guilt; and (4) whether the defendant is free to leave the place of questioning." *State v. Countryman*, 572 N.W.2d 553, 558 (Iowa 1997). As noted, our review of the record is de novo. [3]

The first factor is not an issue. The deputy did not "summon" Schaul; he testified Schaul was taken to the hospital and he was directed to follow.[4]

As for the purpose, place, and manner of interrogation, it was essentially undisputed that the purpose of transporting Schaul to the hospital was for medical treatment. The deputy testified there were "[s]everal nurses, doctors" in the "ER room" with him and "for the most part" he tried "to stay out of their way" and "let them tend to him on a medical basis first." He followed medical personnel to another room where they performed a CT scan and catheterized Schaul. He

---

[3] Although counsel made reference to a suppression transcript in his postconviction brief, that transcript appears not to have been included in our record on appeal. However, the deputy's deposition transcript taken before the suppression hearing as well as his report are in our record. With one exception, which we will discuss, we find these documents adequate to address the claim.

[4] There is no indication who directed the deputy to follow the ambulance.

testified he was "[f]ollowing along at that point, keeping Mr. Schaul under observation to a point where [he] was able to approach him where [he] wasn't interfering with his medical treatment." He said he asked Schaul about taking a preliminary breath test before the CT scan and Schaul tried to comply, with some difficulty. The deputy "attempted to have him try another one" but Schaul "appeared to be in some discomfort and said . . . he didn't want to," so the deputy "did not force the issue." The deputy asked him "how much he had to drink, and he said he had a few beers." The deputy read him the implied consent advisory and "asked him if he understood it." Schaul "said he was unsure [and] requested to contact a lawyer." The deputy thrice attempted to call the lawyer Schaul identified, without success. The deputy asked Schaul a second time if he was able to try taking the preliminary breath test. Schaul refused based on the pain and discomfort he was experiencing. The deputy asked how much he drank. Schaul responded "somewhere between eight to ten beers." The deputy asked him whether he wished to consent to a blood test and Schaul "said no." He said he "did not wish to make that decision without contacting his attorney."

We agree with the district court that the purpose, place, and manner of the questioning do not suggest Schaul was deprived of his freedom in any significant way. *See Peterson*, 663 N.W.2d at 423. He was in the hospital for treatment, he was not under the exclusive control of law enforcement officers, and the deputy asked relatively few questions over the span of his three-hour stay. *See State v. Chiavetta*, No. 05-1911, 2007 WL 1828323, at *2 (Iowa Ct. App. June 27, 2007).

The third factor—the extent to which the defendant was confronted with evidence of his guilt—is largely absent. Although the deputy asked Schaul about

his drinking, he did not revisit the circumstances of the crime or the discoveries made at the scene. *Cf. Peterson*, 663 N.W.2d at 428 ("Detective Moller began telling Peterson about the murder investigation to solicit information from Peterson.").

In evaluating the final factor—whether the defendant was free to leave the place of questioning—Schaul cites the suppression transcript. We assume without deciding the deputy testified Schaul was not free to leave the hospital, as Schaul contends and the district court found. Certain exhibits support that testimony. For example, a sergeant reported he relieved the deputy at the hospital for a brief period and he "allowed" Schaul's mother to visit him. The language suggests law enforcement officers controlled ingress and egress from the area surrounding Schaul. At the same time, the officers did not physically restrain Schaul and the deputy who was with him most of the time reported Schaul "depart[ed] St. Lukes" and was later readmitted for treatment of his injuries. At the end of the day, we find this factor to be in equipoise. *Cf. State v. Tyler*, 867 N.W.2d 136, 174 (Iowa 2015) (finding defendant was free to leave where the door to the interview room at the police station was closed but unlocked, the defendant's "path to it was unobstructed," and the special agent told the defendant the closed door should not "deter her from leaving."); *State v. Ellenbecker*, No. 12-2229, 2014 WL 1999291, at *7 (Iowa Ct. App. May 14, 2014) (determining the defendant was not free to leave where a law enforcement officer restrained him until an ambulance arrived and rode with him in the ambulance and given the totality of the circumstances surrounding Ellenbecker's apprehension).

We conclude that, because Schaul was not summoned to the hospital by law enforcement officers, underwent medical treatment while at the hospital, was questioned only briefly and was not confronted with evidence of his guilt, Schaul was not in custody. Accordingly, the Fifth Amendment was not implicated, and direct-appeal counsel did not breach an essential duty in failing to challenge the district court's suppression ruling.

Finally, Schaul argues his Sixth Amendment right to counsel was violated during his hospital stay, and direct-appeal counsel was ineffective in failing to challenge the court's suppression ruling on this ground.

> Our Sixth Amendment analysis involves two steps: (1) whether the right to counsel had attached when the accused made the incriminating statements, and (2) if so, whether the accused waived his or her right before making the statements. An accused's Sixth Amendment right to counsel attaches upon initiation of adversary criminal judicial proceedings. Such proceedings are initiated by formal charge, preliminary hearing, indictment, information, or arraignment.

*Peterson*, 663 N.W.2d at 426 (citations and internal quotation marks omitted).

Schaul's Sixth Amendment right to counsel had not attached when he was questioned at the hospital. Accordingly, direct-appeal counsel did not breach an essential duty in failing to challenge the suppression ruling on this ground.

We affirm the district court's denial of Schaul's postconviction-relief application.

**AFFIRMED.**